In the

# United States Court of Appeals

## For the Seventh Circuit

No. 12-1678

SEYON R. HAYWOOD,

*Plaintiff-Appellant,*

*v.*

JODY HATHAWAY,

*Defendant-Appellee.*

Appeal from the United States District Court
for the Southern District of Illinois.
No. 3:09-cv-00807-MJR-SCW — **Michael J. Reagan**, *Chief Judge*.

ARGUED OCTOBER 30, 2013 — DECIDED NOVEMBER 29, 2016

Before EASTERBROOK, RIPPLE, and WILLIAMS, *Circuit Judges*.

PER CURIAM. Seyon Haywood, formerly an inmate at Illinois's Shawnee Correctional Center, accused his auto mechanics teacher of attacking him. Guards charged him with making false statements. A disciplinary panel found him guilty and ordered him transferred to segregation for two months; the panel also revoked one month of good-time credit. After

these events he was transferred to a different prison, where he remains in custody.

Haywood contends in this proceeding under 42 U.S.C. §1983 that these penalties violate his right to speech, protected by the Constitution's First Amendment (applied to states by the Fourteenth). He also alleges that the conditions of his confinement in segregation were cruel and unusual, violating the Eighth Amendment (again applied via the Fourteenth). The district court dismissed the first claim on the pleadings and granted summary judgment to defendants on the second. The only defendant against whom Haywood still seeks damages is Jody Hathaway, Shawnee's Warden during Haywood's time there.

The district court dismissed the First Amendment claim because the disciplinary panel's decision, which affected the duration of Haywood's confinement, had not been set aside on collateral review or by executive clemency. The Supreme Court held in *Heck v. Humphrey*, 512 U.S. 477 (1994), that §1983 cannot be used to seek damages when relief necessarily implies the invalidity of a criminal conviction that remains in force. *Edwards v. Balisok*, 520 U.S. 641 (1997), extends this approach to prison discipline. Haywood offers two responses: first, that his good-time credits have now been restored, and, second, that he has waived any challenge to the duration of his confinement and therefore (he contends) should be allowed to seek damages.

Although Haywood maintains that his good-time credits were restored while this appeal has been pending, the forms that Haywood has submitted show only the Department of Corrections's calculation of his projected release date, not whether the disciplinary board's decision has been vacated in

the manner *Heck* and *Edwards* require. At all events, things that happen after a district court's decision do not demonstrate that the court erred. *Heck* and *Edwards* hold that a §1983 claim does not accrue until the conviction or discipline had been set aside. Once that occurs, the prisoner has the time allowed by the statute of limitations (two years in Illinois) to commence suit. A dismissal under *Heck* and *Edwards* is without prejudice to litigation after a conviction or disciplinary sanction is annulled.

As for his waiver of any challenge to the duration of confinement: that's irrelevant because no matter what a prisoner demands, or waives, §1983 cannot be used to contest the fact or duration of confinement. See *Preiser v. Rodriguez*, 411 U.S. 475 (1973). From its outset, this suit has been a quest for money damages. That's not all. The holding of *Heck* and *Edwards* is that a claim under §1983 does not accrue as long as it would imply the invalidity of a conviction or disciplinary sanction that affects the duration of custody. If the claim has not accrued, it cannot matter what relief a prisoner seeks. Yet if it is possible to seek damages while waiving other relief, this must mean that the claim accrues immediately and the statute of limitations runs from the time of the events said to be wrongful. That would surprise the many prisoners who wait patiently until they are entitled to sue under *Heck*, for if Haywood is right the time to do so could have expired.

Haywood relies on *Peralta v. Vasquez*, 467 F.3d 98 (2d Cir. 2006), which held that a prisoner who foreswears any contest to the length of his confinement may use §1983 to seek damages. The Second Circuit understood "the purpose of the *Heck* favorable termination requirement [to be] to prevent prison-

ers from using §1983 to vitiate collaterally a judicial or admin-
istrative decision that affected the overall length of their con-
finement". 467 F.3d at 104. To disavow any collateral attack on
the conviction or revocation of good-time credits is to take the
situation outside *Heck*, the court concluded. We do not agree
with that conclusion, which no other circuit has adopted
(though none has expressly rejected it, either).

*Heck* and *Edwards* say that a challenge is not possible as
long as it is inconsistent with the validity of a conviction or
disciplinary sanction. See also *Nelson v. Campbell*, 541 U.S. 637,
646 (2004): "a §1983 suit for damages that would 'necessarily
imply' the invalidity of the fact of an inmate's conviction, or
'necessarily imply' the invalidity of the length of an inmate's
sentence, is not cognizable under §1983 unless and until the
inmate obtains favorable termination of a state, or federal ha-
beas, challenge to his conviction or sentence." This is a version
of issue preclusion (collateral estoppel), under which the out-
standing criminal judgment or disciplinary sanction, as long
as it stands, blocks any inconsistent civil judgment. See *Simp-
son v. Nickel*, 450 F.3d 303 (7th Cir. 2006); *DeWalt v. Carter*, 224
F.3d 607 (7th Cir. 2000); *Carr v. O'Leary*, 167 F.3d 1124 (7th Cir.
1999). It is a rationale considerably different from the one that
*Peralta* attributed to the Court.

In *Wallace v. Kato*, 549 U.S. 384, 392 (2007), the Justices em-
phasized another of *Heck*'s rationales:

> [*Heck*] analogized [the §1983] suit to one for malicious prosecu-
> tion, an element of which is the favorable termination of criminal
> proceedings. [512 U.S.] at 484. We said:
>
> > "[I]n order to recover damages for allegedly unconstitutional
> > conviction or imprisonment, or for other harm caused by ac-
> > tions whose unlawfulness would render a conviction or sen-
> > tence invalid, a §1983 plaintiff must prove that the conviction

> or sentence has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called into question by a federal court's issuance of a writ of habeas corpus, 28 U.S.C. §2254. A claim for damages bearing that relationship to a conviction or sentence that has not been so invalidated is not cognizable under §1983. *Id.*, at 486–487 (footnote omitted)."

> We rested this conclusion upon "the hoary principle that civil tort actions are not appropriate vehicles for challenging the validity of outstanding criminal judgments." *Id.*, at 486. "'Congress,'" we said, "'has determined that habeas corpus is the appropriate remedy for state prisoners attacking the validity of the fact or length of their confinement, and that specific determination must override the general terms of §1983.'" *Id.*, at 482 (quoting *Preiser v. Rodriguez*, 411 U. S. 475, 490 (1973)).

Nothing in *Heck*, *Edwards*, or any of the Court's later decisions suggests that the "favorable termination" element that the Court thought essential can be elided by a plaintiff's disavowing a kind of relief that *Preiser* holds is never available under §1983 in the first place. The approach taken in *Peralta* is incompatible with *Heck* and its successors; *Peralta* is functionally what would happen if the whole sequence were overruled and only *Preiser* left standing.

*Peralta* is incompatible not only with the Supreme Court's decisions but also with *McCurdy v. Sheriff of Madison County*, 128 F.3d 1144 (7th Cir. 1997), which held that a plaintiff cannot sidestep *Heck* by conceding a conviction's validity. Our decision in *Burd v. Sessler*, 702 F.3d 429, 435–36 (7th Cir. 2012), which holds that a prisoner cannot avoid *Heck* by waiting until the sentence expires and it is too late to file a collateral attack, also is irreconcilable with the Second Circuit's view that a §1983 suit for damages is permissible whenever it cannot

end in a decision that changes the length of a person's confinement. We decline to follow *Peralta*, which did not mention *McCurdy* and therefore created a conflict among the circuits, perhaps unintentionally. We shall stick with the established law of this circuit.

Haywood's Eighth Amendment claim is unaffected by *Heck*. He contends that the cell in which he was held during his 60-day term of segregation had a broken window and that, when the prison's power failed during a storm in January 2010, the heat went off and the temperature fell below freezing. Haywood maintains that the guards refused to repair the window or provide adequate clothing and blankets. Instead, he asserts, the guards made conditions worse by turning on the ventilation system (which he calls "the blowers"). Wind aggravates the effect of cold by increasing the speed at which heat is removed from exposed skin.

According to Haywood, power and heat were off for four days, and when power was restored the cell remained frigid and the guards continued to ignore his request to fix the window or provide blankets, a coat, or any other means of warmth. If circumstances were as Haywood asserts, then the prison violated his constitutional rights. *Dixon v. Godinez*, 114 F.3d 640, 642 (7th Cir. 1997); *Henderson v. DeRobertis*, 940 F.2d 1055, 1059 (7th Cir. 1991). See also *Petties v. Carter*, 836 F.3d 722 (7th Cir. 2016) (en banc) (discussing standards of liability under the Eighth Amendment in medical-care situations). There may be reasons to doubt Haywood's account—if the cell was as cold and his clothing as skimpy as he relates, he would have suffered frostbite or death, yet he is alive and whole— but on motion for summary judgment we must accept the declarations in his affidavit.

The district court granted summary judgment not because it discounted Haywood's evidence or thought the conditions acceptable, but because of the identity of the sole defendant: the warden. Haywood did not sue (or, if he did sue, did not serve) the guards and other persons responsible for climate control. He sued only the top of the organization, and the district court concluded that the warden cannot be personally liable under the Supreme Court's decision in *Ashcroft v. Iqbal*, 556 U.S. 662, 677 (2009), that organizational heads and other supervisors are not vicariously liable for their subordinates' misdeeds. They are liable for their own acts but not derivatively liable for other persons' acts.

*Farmer v. Brennan*, 511 U.S. 825 (1994), supplies the substantive rule of decision. There "the Supreme Court held that prison officials have a duty to 'ensure that inmates receive adequate food, clothing, shelter, and medical care.'" *Estate of Miller ex rel. Bertram v. Tobiasz*, 680 F.3d 984, 989 (7th Cir. 2012) (quoting *Farmer*, 511 U.S. at 832). To determine whether an inmate's Eighth Amendment rights were violated by a deprivation, we examine the alleged violation both objectively and subjectively. First, the deprivation alleged must be objectively, sufficiently serious. Second, the mental state of the prison official must have been one of deliberate indifference to inmate health or safety. See *Petties*, 836 F.3d at 728. The first element is satisfied when the plaintiff shows that he was "incarcerated under conditions posing a substantial risk of serious harm." *Sanville v. McCaughtry*, 266 F.3d 724, 733 (7th Cir. 2001). There is no question that the circumstances described by Haywood satisfy this element.

To meet the second element, a plaintiff must show that "'the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.'" *Estate of Miller*, 680 F.3d at 989 (quoting *Sanville*, 266 F.3d at 734. A plaintiff need not "prove that his complaints … were 'literally ignored,'; rather, he must show only that defendants' responses to it were so plainly inappropriate as to permit the inference that the defendants intentionally or recklessly disregarded his needs." *Hayes v. Snyder*, 546 F.3d 516, 524 (7th Cir. 2008) (citation omitted) (quoting *Sherrod v. Lingle*, 223 F.3d 605, 611 (7th Cir. 2000)). Our en banc decision in *Petties* took this approach to medical-care claims, and it is equally applicable to related claims under the Cruel and Unusual Punishments Clause.

Haywood brought forth evidence in opposition to Warden Hathaway's motion for summary judgment that Warden Hathaway knew both of the extreme cold in the segregation unit and the causes of that cold. Specifically, the warden knew of the ice storm that caused the prison to lose power, see R.87-4 (Warden Hathaway's answers to interrogatories) at 16; he was apprised that Haywood could not shut his window, see R.1 at 19 (Emergency Grievance attached as exhibit to Complaint) ("There is lots of air coming in through the windows because the seals on the outside are broken."); and he personally toured the segregation unit at least once between January and March 2009, see R.87-4 at 22 ("Defendant did go to Segregation during this time frame [between January 9, 2009, and March 9, 2009].").

The extent of the warden's response to this information, however, was that he "enured [sic] that the generators were operating properly and had maintenance perform periodic temperature checks." *Id*. at 23. Nothing in the record indicates how frequently Warden Hathaway had maintenance perform temperature checks, whether those were performed during or after the power outage, or, indeed, whether any were performed apart from the check of the unit on January 23—one of the warmest days of the winter. Moreover, the fact that the generators were operational would have little effect on the temperature of the unit if, as Haywood testified, the windows in the unit would not close. The warden's "plainly inappropriate" responses to Hathaway's grievance, to the extreme weather, and to the situation in the segregation unit allow the inference that he was deliberately indifferent to the extreme cold suffered by Haywood and the other prisoners. See *Hayes*, 546 F.3d at 524.

Our dissenting colleague reads *Iqbal* and *Vance v. Rumsfeld*, 701 F.3d 193 (7th Cir. 2012) (en banc), to support a contrary result. We do not believe, however, that *Iqbal* or *Vance* alters the standards set forth in *Farmer v. Brennan*. Indeed, *Iqbal* recognizes that "[t]he factors necessary to establish a *Bivens* violation will vary with the constitutional provision at issue." 556 U.S. at 676. In *Iqbal*, the *Bivens* claim alleged was "invidious discrimination" on the basis of race, religion, and national origin "in contravention of the First and Fifth Amendments." *Id*. In such situations, the Court explained, "our decisions make clear that the plaintiff must plead and prove that the defendant acted with discriminatory purpose," *id*., and "a supervisor's mere knowledge of his subordinate's discriminatory purpose" is not sufficient, *id*. at 677. *Iqbal* simply did not

speak to standards of liability for Eighth Amendment viola-
tions, for Iqbal had not made a claim under that provision,
and the Court certainly gave no indication of discontent with
the settled law set forth in *Farmer*. Moreover, even if it had
signaled an intent to depart from *Farmer*, the Supreme Court
has admonished us not to anticipate its future steps. See, e.g.,
*Bosse v. Oklahoma*, No. 15–9173 (U.S. Oct. 11, 2016) (collecting
authority).

This court's decision in *Vance* is not without its ambigui-
ties. But one thing is clear: it must be read to conform to
*Farmer*, the governing authority. It cannot be read, as the dis-
sent does, as altering the standards of *Farmer*. In *Vance*, the
plaintiffs alleged "torture and cruel, inhuman, and degrading
treatment, … presented as Fifth Amendment substantive due
process claims," *Vance v. Rumsfeld*, 653 F.3d 591, 594 (7th Cir.
2011), vacated en banc, 701 F.3d 193, and sought damages
from the former Secretary of Defense. The specific question
before the court was "whether the federal judiciary should
create a right of action for damages against soldiers (and oth-
ers in the chain of command) who abusively interrogate or
mistreat military prisoners, or fail to prevent improper deten-
tion and interrogation." *Vance*, 701 F.3d at 195. We answered
this question in the negative. We further observed that "[e]ven
if we were to create a common-law damages remedy against
military personnel and their civilian superiors, former Secre-
tary Rumsfeld could not be held liable." *Id*. at 203. We ob-
served that

> *Farmer* rejected a contention that wardens (or guards) can be liable
> just because they know that violence occurs in prisons and don't
> do more to prevent it on an institution-wide basis. To get any-
> where, Vance and Ertel would need to allege that Rumsfeld knew

of a substantial risk to security contractors' employees, and ignored that risk because he wanted plaintiffs (or similarly situated persons) to be harmed.

*Id*. at 204. This dicta overstates *Farmer*'s holding. *Farmer* instructs that the deliberate indifference standard "is satisfied by something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result":

> We hold … that a prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.

*Farmer*, 511 U.S. at 835, 837.

In any event, the standard articulated in *Vance* is satisfied here. The evidence showed that Warden Hathaway had actual knowledge of the unusually harsh weather conditions, that he had been apprised of the specific problem with the physical condition of Haywood's cell (i.e., the windows would not shut), and that, during the time period of Haywood's complaint, the warden toured the segregation unit himself. These facts establish that Warden Hathaway's response was not simply "plainly inappropriate," but that Haywood's complaints "literally [were] ignored" by the individual in the position to remedy them. *Hayes*, 546 F.3d at 524 (internal quotation marks omitted).

In short, there simply is no evidence that, in *Iqbal*, the Supreme Court overruled or limited *Farmer*. See *Minneci v. Pollard*, 132 S. Ct. 617, 625 (2012) (noting *Farmer*'s deliberate indifference standard). *Vance*, as well, has no direct application

to this case. *Vance* concerned the possibility of holding the cabinet secretary of a federal department responsible for the implementation of policy at the individual level—a far cry from holding the administrator of a single facility liable for known deficiencies that directly threatened the welfare of prisoners for whom he was responsible. See 730 ILCS 5/3-6-2 ("A chief administrative officer shall be responsible for all persons assigned to the institution or facility."). *Vance* did not alter—nor could it alter—the standards set forth in the Court's Eighth Amendment caselaw. Indeed, since *Vance*, we have continued to apply *Farmer* to allegations of unconstitutional conditions of confinement. See *Townsend v. Cooper*, 759 F.3d 678, 685, 689 (7th Cir. 2014) (applying *Farmer* to claims brought against the warden and other prison officials who were involved in the decision to impose a behavior action plan that resulted in unconstitutional conditions of confinement).

Consistent with our approach in *Townsend*, other courts of appeals have determined that, post-*Iqbal*, *Farmer*'s deliberate indifference standard continues to govern claims of un-constitutional conditions of confinement brought against supervisory prison officials. See *Barkes v. First Correctional Medical, Inc.*, 766 F.3d 307, 316–20 (3d Cir. 2014) (holding that deliberate indifference standard "for imposing supervisory liability based on an Eighth Amendment violation is consistent with *Iqbal*" and collecting cases), reversed on other grounds under the name *Taylor v. Barkes*, 135 S. Ct. 2042 (2015) (holding that defendants were entitled to official immunity and not addressing the merits); see also *Colwell v. Bannister*, 763 F.3d 1060 (9th Cir. 2014) (applying *Farmer*'s deliberate indifference standard to evaluate liability of prison official post-*Iqbal*).

The judgment is affirmed with respect to the First Amendment theory and reversed with respect to the Eighth Amendment theory. The case is remanded for proceedings consistent with this opinion.

EASTERBROOK, *Circuit Judge*, dissenting in part. I agree with the court's disposition of Haywood's First Amendment claim but not with its conclusion that Warden Hathaway can be personally liable for cold temperatures in his cell.

Haywood seeks to hold the warden directly (rather than derivatively) liable on the theory that he filed two grievances alerting the warden to the cold. But *Iqbal* concludes that knowledge is not enough.

> [Respondent argues that supervisors] can be liable for "knowledge and acquiescence in their subordinates' use of discriminatory criteria to make classification decisions among detainees." Iqbal Brief 45–46. That is to say, respondent believes a supervisor's mere knowledge of his subordinate's [misconduct] amounts to the supervisor's violating the Constitution. We reject this argument. Respondent's conception of "supervisory liability" is inconsistent with his accurate stipulation that [supervisors] may not be held accountable for the misdeeds of their agents. In a §1983 suit or a *Bivens* action—where masters do not answer for the torts of their servants—the term "supervisory liability" is a misnomer. Absent vicarious liability, each Government official, his or her title notwithstanding, is only liable for his or her own misconduct.

556 U.S. at 677. We applied this principle in *Vance v. Rumsfeld*, 701 F.3d 193, 203–05 (7th Cir. 2012) (en banc), when holding that notice to the Secretary of Defense about subordinates' misconduct did not expose the Secretary to damages for failing to ensure that it stopped. The Secretary may be liable for unlawful policies but does not guarantee that lawful policies are carried out correctly. See also, e.g., *Burks v. Raemisch*, 555 F.3d 592 (7th Cir. 2009), which holds that prison officials who receive and respond to prisoners' grievances do not become vicariously liable just because they fail to ensure that the grievances are properly redressed. Just as a prison's warden

in Illinois is responsible for all employees, 730 ILCS 5/3-6-2, so a Secretary of Defense has full authority over all of his subordinates. 10 U.S.C. §113(b). Yet *Vance* held that insufficient to make the Secretary liable for failing to prevent their misconduct.

No one contends that Warden Hathaway had a policy that authorized, or even tolerated, subjecting prisoners to freezing temperatures. To the contrary, it is undisputed that, when he received Haywood's first grievance, he directed one of the prison's engineers to find out what was happening. The engineer told the warden that the temperature in Haywood's cell was 75° F, and the warden then dismissed the grievance. If the engineer was lying, he might face liability, but it is impossible to see how the warden himself could be liable—and that conclusion would hold even if *Iqbal* had come out the other way and held that supervisors can be liable just because they know that subordinates are misbehaving. Haywood's description of the blowers as "torture" does not add anything, because air movement at 75° is hardly an intolerable condition of confinement. And Haywood's second complaint to the warden also does not add anything, not only because of *Iqbal* but also because the record shows that it did not reach the warden's desk until March 9, 2010, the day that Haywood was returned to the general population. Nothing the warden did, or omitted, in response to the second grievance could have affected Haywood.

Prisoners need to sue the persons responsible for the conditions of which they complain. A warden is an easy target—his name is known, and it is easy to achieve service of process. But decisions such as *Iqbal* and *Vance* mean that liability rests with the people who injure prisoners; the top of a bureaucratic

hierarchy is the wrong person to sue, unless the claim concerns the prison's formal policies or other decisions that the warden took personally.

I do not read *Iqbal* or *Vance* as incompatible with *Farmer*, which did not address the question whether supervisors can be liable for failing to cure problems created or ignored by their subordinates. By contrast, *Iqbal* and *Vance* do address that situation. We observed in *Vance* that a supervisor does not become liable just because someone sends him a message notifying him that bad things are going on. That's what plaintiffs alleged in *Vance*, and a panel held the allegation sufficient, but the en banc court held it legally insufficient. 701 F.3d at 203–05. (Part IV of *Vance*, which announces this conclusion, cannot be dismissed as dictum; it was an alternative holding. The fact that a court gives two independently sufficient reasons for a disposition does not mean that each is dictum because the other would have sufficed; on that approach, the whole opinion could be dismissed as dictum.)

*Vance* shows that supervisors are entitled to delegate. The top of an organization must be able to allocate duties without being personally liable if subordinates mess up. Warden Hathaway delegated. He sent an engineer to diagnose the situation and fix any problem. The engineer reported that there was no problem. Haywood chose not to sue the engineer, the engineer's subordinates, or the personnel who should have repaired any broken window, but Haywood's choice cannot mean that the warden becomes personally liable for his subordinates' inaction or ineptitude.

My colleagues are among many federal judges who prefer an approach under which notice to a supervisor is enough to create personal liability. The Supreme Court encountered

such an approach in *Iqbal* and disapproved it. When a panel of this court adopted that approach in *Vance*, the court took the case en banc and disapproved it. As my colleagues observe, decisions in other circuits have continued to impose supervisory liability when notice does not lead to a remedy. They cite *Barkes v. First Correctional Medical, Inc.*, 766 F.3d 307, 320 (3d Cir. 2014), and *Colwell v. Bannister*, 763 F.3d 1060 (9th Cir. 2014), and might have added a citation to *Turkmen v. Hasty*, 789 F.3d 218, rehearing en banc denied, 808 F.3d 197 (2d Cir. 2015). *Barkes* has been reversed on immunity grounds, 135 S. Ct. 2042 (2015), and the Justices did not tell us their view of the merits; *Colwell* concerned supervisors' policies and not just failure to control subordinates, so its bearing on our dispute is doubtful; but *Turkmen* deals with both policy-creation and subordinate-control in one package.

The grants of certiorari in *Turkmen* set the stage for a new look at the question whether and when supervisors (including Hasty, a prison's warden) can be liable for failing to prevent or rectify misconduct by guards and other subordinates. See *Zilgar v. Turkmen*, No. 15–1358 (U.S. Oct. 11, 2016) (consolidated with *Ashcroft v. Turkmen*, No. 15–1359, and *Hasty v. Turkmen*, No. 15–1363). The sort of dispute represented by Haywood's Eighth Amendment claim is now in the hands of the Supreme Court. *Turkmen* may be decided on other grounds (the lead argument is that the Second Circuit erred in implying a *Bivens* remedy against supervisors, while §1983 supplies an express remedy in our case), but even so *Turkmen* may reflect on the circumstances under which heads of organizations who are alerted to problems but don't fix them can be liable for that failure. They ducked in *Barkes*, a summary reversal, but may conclude that resolution is due in *Turkmen*, which will be briefed and argued.