PILLARD, Circuit Judge,
dissenting:
As the majority observes, the allegations in this case are deeply troubling. See Maj. *432 Op. at 418. For purposes of this decision, we must assume the truth of the facts Meshal alleges. The defendant FBI officers arbitrarily detained Meshal in secret in three different countries for four months without charges, denied him access to counsel and the courts, coercively interrogated him, and threatened him with disappearance and death. Id. at 418-20. They did so to “coerce him to confess to wrongdoing in which he had not engaged and to associations he did not have.” J.A. 16 (Complaint ¶3). Neither the United States nor any other government ever charged Meshal with a crime. Maj. Op. at 419-20. Our concurring colleague asserts that “U.S. officials were indisputably attempting to seize and interrogate suspected al Qaeda terrorists in a foreign country during wartime,” Cone. Op. 'at 430, but there is zero basis here on which we could conclude that these defendants had grounds for treating this plaintiff as a suspected al Qaeda terrorist, or that they acted pursuant to the President’s war powers. To the contrary, the government never designated Meshal an enemy combatant, and it eventually released him and returned him to the United States. Maj. Op. at 419. Neither defendants nor this panel doubts that Meshal properly stated Fourth and Fifth Amendment claims. See J.A. 14; Maj. Op. at 419-20. The only issue is whether, if the allegations were true, they would have consequences.
Had Meshal suffered these injuries in the United States, there is no dispute that he could have sought redress under Bivens. If Meshal’s tormentors had been foreign officials, he could have sought' a remedy under the Torture Victim Protection Act. Yet the majority holds that because of unspecified national security and foreign policy concerns, a United States citizen who was arbitrarily detained, tortured, and threatened with disappearance by United States law enforcement agents in Africa must be denied any remedy whatsoever.
I would reverse the judgment dismissing Meshal’s case and remand for further proceedings for the following two reasons:
First, congressional action supports a constitutional damages claim where, as here, it would not intrude on the unique disciplinary structure of the military and where there is no comprehensive regulation or alternative remedy in place; and
Second, where FBI agents arbitrarily detain a United States citizen overseas and threaten him with disappearance and death during months of detention without charges, those agents’ mere recitation of foreign policy and national security interests does not foreclose a constitutional damages remedy.
I am unpersuaded that adjudicating Meshal’s . constitutional damages claim would necessarily pose unacceptable risks to the national security and foreign policy of the United States. The government has submitted no certification or declaration of any authoritative diplomatic or national security officer to substantiate defendants’ sweeping national security and diplomatic relations claims. Defendants instead rely on generalized assertions that any litigation of Meshal’s Bivens claim would involve unacceptable risks. Such assertions do not, in my view, constitute the kind of “special factors” that justify eliminating the Bivens remedy in a case like this one.
Courts have no power to make national security policy or conduct foreign affairs and, in fulfilling our own constitutional duty, the Article III courts must not imperil the foreign relations or national security of the United States. But no less today than when the Supreme Court decided Bivens, “the judiciary has a particular responsibility to assure the vindication of constitutional interests such as those *433 embraced by the Fourth Amendment.” Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics, 403 U.S. 388, 407, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971) (Harlan, J., concurring in judgment). Government is most tempted to disregard individual rights during times of exigency. Judicial scrutiny becomes particularly important when executive officials assert that individual rights must yield to national security and foreign policy imperatives. Presented with cases involving assertions of paramount national interests in apparent tension with individual liberty, the federal courts have proved competent to adjudicate. Removing all consequence for violation of the Constitution treats it as a merely precatory document. See Davis v. Passman, 442 U.S. 228, 242, 99 S.Ct. 2264, 60 L.Ed.2d 846 (1979). We should not do so without more justification than was presented here.
Our responsibility in cases pitting claims of individual constitutional liberties against national security is to discern how the judiciary can meet its responsibility without either second-guessing the sound judgments of the political branches, or rubber-stamping every invocation of the capacious and malleable concept of “national security” at the expense of the liberty of the people. The fundamental character of our separation of powers prevents us from simply ceding to executive prerogatives: “[I]t would turn our system of checks and balances on its head to suggest that a citizen could not make his way to court with a challenge to the factual basis for his detention by his Government, simply because the Executive opposes making available such a challenge.” Hamdi v. Rumsfeld, 542 U.S. 507, 536-37, 124 S.Ct. 2633, 159 L.Ed.2d 578 (2004).
To meet that responsibility, courts have demanded that governmental assertions of national security interests be authoritative and specific. We have used special procedures and mechanisms to consider those interests and accord them appropriate respect without abdicating our constitutional duties to adjudicate claims of violation of individual constitutional rights. Measures such as courts’ inspection of evidence under seal or even in camera, coding to anonymize valuable and sensitive information, security clearances of counsel and court personnel, and other special accommodations have helped to preserve courts’ ability to adjudicate in the face of countervailing executive imperatives. Courts developed the state secrets privilege to safeguard against damaging litigation disclosures of national security information. That doctrine’s requirements are designed to ensure that it not be lightly invoked, and to tailor its impact on countervailing rights. Defendants here contend that they need not submit to any such controls. Rather, they would have us categorically turn away claims that ostensibly touch on national security and foreign policy. No precedent of the Supreme Court, this court, or any other United States court requires that result.
The United States government itself elsewhere cites the availability of Bivens claims as fulfilling our treaty obligations to provide remedies for arbitrary detention and torture wherever it may occur, in peace or conflict. See infra pp. 438-39. Yet defendants would deny that promise, leaving Meshal with no remedy whatsoever — whether under state or federal law, constitutional, administrative, or otherwise. Their position is that an American citizen who ventures beyond our borders has no legal remedy against arbitrary and prolonged detention and mistreatment at the hands of FBI agents — so long as those agents were sent overseas to protect United States interests.
*434 Because I cannot conclude that either the Supreme Court or our court has ever read the Constitution and laws of the United States to support that result, and I am not persuaded that defendants have provided us with grounds to do so here, I respectfully dissent.
I.
Meshal’s case is unlike those in which the Supreme Court or this court has declined to recognize a Bivens remedy. Here, as the majority acknowledges, Meshal is suing the typical Bivens defendant. Maj. Op. at 423. When FBI agents violate a suspect’s Fourth and Fifth Amendment rights by detaining him without charges and threatening him with torture, disappearance, and death, a Bivens remedy is ordinarily available. See id.
Defendants are not among the types of nongovernmental or organizational actors beyond the reach of Bivens: they are not a private corporation, cf. Corr. Servs. Corp. v. Malesko, 534 U.S. 61, 73-74, 122 S.Ct. 515, 151 L.Ed.2d 456 (2000), its employees, cf. Minneci v. Pollard, — U.S.-, 132 S.Ct. 617, 623-26, 181 L.Ed.2d 606 (2012), or a federal governmental agency, cf. FDIC v. Meyer, 510 U.S. 471, 484-86, 114 S.Ct. 996, 127 L.Ed.2d 308 (1994). See Maj. Op. at 421, 427.
These claims, if allowed to proceed under Bivens, would not sidestep any comprehensive scheme or alternative remedy addressing the conduct at issue. Maj. Op. at 8; cf. Wilkie v. Robbins, 551 U.S. 537, 553-62, 127 S.Ct. 2588, 168 L.Ed.2d 389 (2007); Schweiker v. Chilicky, 487 U.S. 412, 414, 424-29, 108 S.Ct. 2460, 101 L.Ed.2d 370 (1988); Bush v. Lucas, 462 U.S. 367, 388, 103 S.Ct. 2404, 76 L.Ed.2d 648 (1983); Wilson v. Libby, 535 F.3d 697, 706-08 (D.C.Cir.2008).
Meshal’s claims also do not implicate the unique demands of military discipline. He is not a service member or military contractor, his claims did not arise in the theater of war, nor are the defendant’s asserted security interests those of the military, its chain of command, or alternate disciplinary structure. Cf. United States v. Stanley, 483 U.S. 669, 683-84, 107 S.Ct. 3054, 97 L.Ed.2d 550 (1987); Chappell v. Wallace, 462 U.S. 296, 303-06, 103 S.Ct. 2362, 76 L.Ed.2d 586 (1983); Doe v. Rumsfeld, 683 F.3d 390, 394-96 (D.C.Cir.2012); Lebron v. Rumsfeld, 670 F.3d 540, 549-51, 553 (4th Cir.2012); Vance v. Rumsfeld, 701 F.3d 193, 199-203 (7th Cir.2012) (en banc).
The foreign affairs implications that arise when an alien sues United States officials are absent here. Meshal is an American citizen, born and raised in New Jersey, to whom the constitutional protections asserted here apply both at home and when he goes overseas as a civilian tourist. Reid v. Covert, 354 U.S. 1, 5-10, 77 S.Ct. 1222, 1 L.Ed.2d 1148 (1957) (plurality) (rejecting “the idea that when the United States acts against citizens abroad it can do so free of the Bill of Rights”); Maj. Op. at 422-23 n. 4; Oral Arg. Tr. at 19 (defendants’ counsel acknowledging constitutional rights of United States citizens abroad). Conflict within Somalia displaced Meshal and other civilians, but Meshal does not allege he was arrested or detained in any zone in which the United States was engaged in war or military hostilities. J.A. 13.
Precedent does not permit us categorically to rule out any civil remedy for these alleged wrongs. In my view, defendants’ national security and foreign policy “special factors” are overstated and under-explained. I do not read the Supreme Court’s cases to hold that “the thumb is heavy on the scale against recognizing a Bivens remedy” in a situation such as this *435 one. Maj Op. at 428. To the contrary, the Supreme Court’s holding in Bivens that damages are an appropriate remedy for a Fourth Amendment violation remains the law of the land. And no one disputes that a Fifth Amendment claim for arbitrary detention and coercive interrogation under threats of disappearance and death would be cognizable under Bivens if it occurred in the United States. See Wilkins v. May, 872 F.2d 190, 194 (7th Cir.1989) (Posner, J.) (recognizing Bivens Fifth Amendment due process claim in “a case in which a person who had been arrested but not charged or convicted was brutalized while in custody”), cert. denied, 493 U.S. 1026, 110 S.Ct. 733, 107 L.Ed.2d 752 (1990); see also Hernandez v. United States, 757 F.3d 249, 271, 277 (5th Cir.2014) (recognizing Bivens Fifth Amendment claim extraterri-torially for “conscience-shocking conduct”).
Defendants assert that any judicial consideration of Meshal’s claims would interfere with foreign policy and national security, but they have failed to make the case. In the district court, defendants’ counsel said “I don’t know how the foreign government is alleged to have been involved in this particular operation.” J.A. 14. At oral argument in our court, as the majority notes, counsel for defendants “had few concrete answers concerning what sensitive information might be revealed if the litigation continued.” Maj. Op. at 425.
The only authority defendants cite for any threat to national security is the district court’s recapitulation of defendants’ own contentions in their lower-court briefs that litigation of Meshal’s claims “implicate national security threats in the Horn of Africa region” and “substance and sources of intelligence.” See Appellee Br. 11, 13, 24-27, 36-37; Br. in Supp. of Mot. to Dismiss at 13-14. They assert that adjudication would require the public release of sensitive national security information, but they provide no .basis for us to evaluate that assertion. Defendants also have done nothing to explain why the more targeted tools available to courts to protect such information, such as confidential or in camera processes or the state secrets privilege, would be inadequate here.
II.
I explain my conclusion by following the “familiar sequence” the Supreme Court employs to consider whether any “alternative, existing processes,” or “special factors” justify denying Meshal’s Bivens claim. Wilkie, 551 U.S. at 550, 127 S.Ct. 2588.
A.
Precedent directs us to consider first “whether any alternative, existing process for protecting the [constitutionally recognized] interest amounts to a convincing reason for the Judicial Branch to refrain” from superimposing a Bivens remedy on that process. Minneci, 132 S.Ct. at 621 (quoting Wilkie, 551 U.S. at 550, 127 S.Ct. 2588) (brackets in original). Nobody contends that there is any “alternative, existing process” for protecting Meshal’s constitutional rights. See Maj. Op. at 424-25; Conc. Op. at 432-33. The parties and the court agree that, in these circumstances, it is Bivens or nothing. See Davis, 442 U.S. at 246, 99 S.Ct. 2264. Unlike plaintiffs in the cases in which the Supreme Court has held that Bivens is unavailable, Meshal has no alternative state tort remedy, cf. Minneci, 132 S.Ct. at 623, 626 (state tort remedy for alleged Eighth Amendment claims against private prison employees); Wilkie, 551 U.S. at 551, 127 S.Ct. 2588 (state tort remedy for alleged unconstitutional interference with property rights); Malesko, 534 U.S. at 73-74, 122 S.Ct. 515 (state tort remedy for alleged Eighth Amendment *436 claims against private prison corporation), and Congress has not provided any other remedy or comprehensive scheme to displace Bivens here, cf., e.g., Schweiker, 487 U.S. at 424-27, 108 S.Ct. 2460 (Social Security Act); Bush, 462 U.S. at 380-81, 388, 103 S.Ct. 2404 (comprehensive federal civil service regulation); Wilson, 535 F.3d at 705-08 (Privacy Act); Chappell, 462 U.S. at 304, 103 S.Ct. 2362 (recognizing “unique disciplinary structure of the military establishment” as “special factor”).
The majority acknowledges that Congress at various times has acted in ways that appear to have ratified Bivens, but ultimately concludes that congressional acquiescence is “open to doubt,” and so treats the congressional activity in the area as a draw. Maj. Op. at 427-28. The basis of the majority’s doubt is unpersuasive: my colleagues wonder whether Congress' has preserved Bivens for almost half a century only because it thought it had to. Id. at 427-28. But the Supreme Court from Bivens onward has emphasized that Congress may displace the constitutional common-law remedy. In the face of that invitation to legislate, Congress has consistently preserved a place for judicially recognized Bivens claims.
In particular, as the majority acknowledges, even as Congress periodically amended the Federal Tort Claims Act (FTCA), which provides an exclusive federal statutory remedy against the government for state common-law torts by United States officials, Congress purposely left intact the judicially fashioned Bivens remedy for constitutional torts by those same officials. Congress in the 1974 amendments to the FTCA “made it crystal clear that Congress views FTCA and Bivens as parallel, complementary causes of action.” Carlson v. Green, 446 U.S. 14, 19-20, 100 S.Ct. 1468, 64 L.Ed.2d 15 (1980) (citing 28 U.S.C. § 2680(h)). And again, in 1988 when the Westfall Act amended the FTCA to immunize federal officials from personal liability for common law torts committed within the scope of their employment and substitute the United States as the sole defendant to those claims, Congress specified that such substitution-and-immunity does not apply to claims “brought for a violation of the Constitution of the United States.” 28 U.S.C. § 2679(b)(2)(A). Congress designed the Westfall Act so as “not to affect the ability of victims of constitutional torts to seek personal redress from Federal employees who allegedly violate their Constitutional rights” — a type of violation that is “a more serious intrusion on the rights of an individual that merits special attention.” H.R.Rep. No. 100-700, at 6 (1988), reprinted in 1988 U.S.C.C.A.N. 5945, 5949-50. Congress has preserved constitutional damages claims even where they are parallel to and thus sometimes overlap with FTCA claims that provide a limited federal statutory vehicle for enforcing the substantive protections of state tort law; there is no basis to read that longstanding acceptance of Bivens as signaling congressional intent to eliminate constitutional damages claims when no overlapping or substitute claim exists.
The majority recognizes all of that, Maj. Op. at 427-28, but wonders whether Congress may have preserved Bivens only out of concern that the remedy is constitutionally compelled, id. at 427-28. There is no basis for any such conclusion. The concurrence finds compelling that Congress has not codified any alternative remedy for Meshal’s harms. Cone. Op. at 432. But congressional restraint cuts the other way. As noted above, when Congress was making the relevant amendments to the FTCA, the Supreme Court had already repeatedly reiterated its own understanding that the judicially recognized remedy could be displaced by a congressional sub *437 stitute. See, e.g., Bush, 462 U.S. at 378-79, 103 S.Ct. 2404; Carlson, 446 U.S. at 18-20, 100 S.Ct. 1468; Davis, 442 U.S. at 245-47, 99 S.Ct. 2264; Bivens, 403 U.S. at 397, 91 S.Ct. 1999. Despite addressing many other related types of claims, Congress has enacted no alternative that would displace a claim like Meshal’s. Against that backdrop, Congress’s acquiescence cannot be read as misguided submission to, let alone rejection of, Bivens in these circumstances.
Defendants point .out that the FTCA explicitly affords no tort remedy for injuries “arising in a foreign country.” 28 U.S.C. § 2680(k). They contend the exception shows Congress’s intention to deny a constitutional tort remedy to individuals injured abroad by United States agents. But the reason Congress excluded extraterritorial claims from the FTCA was not to deny all damages liability for tort-like harms inflicted by United States agents overseas. That exclusion is specific to the FTCA, under which liability is determined “in accordance with the [tort] law of the place where the act or omission occurred,” 28 U.S.C. § 1346(b)(1), i.e. by the common law of the various states. Congress “was unwilling to subject the United States to liabilities depending upon the laws of a foreign power.” United States v. Spelar, 338 U.S. 217, 221, 70 S.Ct. 10, 94 L.Ed. 3 (1949). The exemption shows only that the FTCA aimed to incorporate the tort law of Texas or Illinois but not of Kenya or Ethiopia. The concerns animating the FTCA’s extraterritorial carve-out are inapplicable where the United States Constitution, not any foreign country’s law, supplies the rule of decision.
The majority also asserts that “if Congress really desired a ratification of Bivens,” it would have “place[d] Bivens causes of actions in a separate statutory provision,” such as 28 U.S.C. § 1331 or 42 U.S.C. § 1983. Maj. Op. at 428 n. 9. But Congress did not need to do that. Section 1331 provides general federal question jurisdiction. It is the very provision upon which Webster Bivens’s claim proceeded. Bivens, 403 U.S. at 398, 91 S.Ct. 1999 (Harlan, J., concurring in judgment). As Justice Harlan noted, Section 1331 “is sufficient to empower a federal court to grant a traditional remedy at law” for a Fourth Amendment violation. Id. at 405, 91 S.Ct. 1999.[1] Demanding a showing that Congress created an analogue to Section 1983 for claims against. federal officials also goes too far; had Congress done so, there would be no need for Bivens. See Lebron, 670 F.3d at 548 (acknowledging that “[w]e do not require congressional action before recognizing a Bivens claim, as that would be contrary to Bivens itself’). And once the Court decided Bivens, there was no need for a Section 1983-like statutory vehicle. Defendants point to other statutes providing remedies to detainees abused at the hands of government officials to argue that Congress could have created a cause of action for plaintiffs in Meshal’s position, but chose not to do so. They contend that congressional action “in this field” that creates no damages remedy for Meshal is a “special factor[] that counsels] hesitation.” Appellee Br. 39. The majority correctly places no reliance on that argu *438 ment. The additional congressional action defendants identify’is wholly consistent with Congress’s acquiescence to Bivens for claims like Meshal’s.
The Military Claims Act and Foreign Claims Act provide an administrative compensation system for individuals harmed by military officials or contractors at home or abroad. See 10 U.S.C. § 2733 (Military Claims Act); id. § 2734 (Foreign Claims Act). Defendants do not contend that any such claims process is available to a civilian harmed by nonmilitary United States agents overseas, so it is unclear how those statutes could imply any congressional disinclination toward Meshal’s Bivens claim. Indeed, the fact that Congress provided a remedy to persons in special-factors .military cases excluded from Bivens’ reach suggests congressional solicitude for persons who would otherwise lack compensation. See Vance, 701 F.3d at 200-01 (enumerating statutes governing the treatment of military detaineés to conclude that “[u]nlike Webster Bivens, they are not without recourse”); Doe, 683 F.3d at 396-97.
The same can be said of defendants’ invocation of the Torture Victim Protection Act, which authorizes United States residents to sue foreign officials for abusive treatment under color of foreign law. 28 U.S.C. § 1350 Note. Defendants and the concurrence, Cone. Op. at 432-33, assert that the Torture Victim Protection Act’s damages remedy for United States residents harmed by foreign officials implies that Congress considered and eschewed a parallel remedy for the same harms inflicted by United States agents. But that statute may well reflect Congress’s awareness that, against United States agents, a remedy already exists under Bivens.[2] Neither defendants nor my concurring colleague offer any reason why we should infer that Congress’s creation of a new remedy against foreign officials communicates its disapproval of the sole available remedy for torture of a United States citizen at the hands of United States nonmilitary agents. Their position appears to be that if Kenyan or Ethiopian officials had worked alongside United States agents to torture Meshal, Congress would have wanted him to have a remedy in United States courts against the foreign agents under the Torture Victim Protection Act, but to have no chance of any parallel relief against the Americans inflicting the same torture. That inference is counterintui-tive, to say the least.
The executive branch in fact publicly insists that victims of arbitrary detention or torture, both of which Meshal alleges, do have a remedy under our law. The remedy the government touts is Bivens litigation in federal court. The Convention Against Torture and other treaties prohibit the United States from engaging in torture, forced disappearances, and arbitrary detentions.[3] As the State Department ac *439 knowledged in 2014, the United States is bound by the terms of the Convention Against Torture for actions committed either domestically or abroad, whether during a time of conflict or peace.[4] Both the Convention Against Torture and the International Covenant on Civil and Political Rights (ICCPR) obligate the United States to provide remedies, including “compensation,” for violations of their respective guarantees.[5] In 2006, the State Department assured the United Nations Committee Against Torture that victims of torture can sue United States officials for damages under the Constitution and cited Bivens to support that point. See United States Written Responses to Questions Asked by the United Nations Committee Against Torture, ¶ 5 (Apr. 28, 2006), available at http://www.state.gOv/j/drl/rls/68554.htm; see also Vance, 701 F.3d at 208-09 (Wood, J., concurring in judgment); id at 219 (Hamilton, J., dissenting); Arar v. Ashcroft, 585 F.3d 559, 619 (2d Cir.2009) (en banc) (Parker, J., dissenting).
Denying Meshal the recourse that the United States has asserted he has — the ability to bring a Bivens action — leads to an inexplicable result: civil remedies are available to most victims of torture, except a United States citizen tortured by United States agents abroad. An American subjected to arbitrary arrest and coercive interrogation by federal officials within the United States would typically have a civil remedy under Bivens. See Maj. Op. at 423. The majority leaves open whether a United States citizen abused by federal agents abroad as part of an investigation not implicating national security would be able to bring a Bivens action and offers no reason why such a suit would be barred. See Maj. Op. at 418, 425. A United States citizen tortured by foreign officials could file suit under the Torture Victim Protection Act. See 28 U.S.C. § 1350 Note. A foreign citizen tortured by United States officials within the United States could file suit under the Federal Tort Claims Act and the Alien Tort Statute. See 28 U.S.C. § 1346(b)(1); id § 1350. And a foreign citizen tortured by American agents acting abroad could seek redress under the Alien Tort Statute or in his nation’s courts. Yet, under defendants’ view, a United States citizen tortured by American agents acting abroad has no recourse in his own nation’s courts. It makes no sense that Congress would have selectively denied to Americans abused abroad by United States agents the remedies it has extended to all others. The far more tenable conclusion is that Congress recognized that citizens al *440 ready had a remedy under Bivens for such wrongs.
The Constitution includes a Bill of Rights because the Framers ultimately recognized that a Congress responsive to the will of the majority would not always adequately protect individual rights that might be unpopular with majorities. Bivens, 403 U.S. at 407, 91 S.Ct. 1999 (Harlan, J., concurring in judgment) (“[I]t must also be recognized that the Bill of Rights is particularly intended to vindicate the interests of the individual in the face of the popular will as expressed in legislative majorities.”). Adjudication of claims of individual rights has always been the distinctive province of the Article III courts. The genius of Bivens is precisely that it fulfilled a rights-protective function that the Framers knew was unrealistic to leave only with a majoritarian Congress, even while the Court acknowledged Congress’s power to displace Bivens by crafting an alternative remedy or “comprehensive statutory scheme” in its stead. See Schweiker, 487 U.S. at 424-27, 108 S.Ct. 2460; Bush, 462 U.S. at 388, 103 S.Ct. 2404. Because Congress has not done so here, it has provided no ground for dismissing Meshal’s Bivens claims.
B.
Our second task in considering whether Meshal may proceed with his Bivens claim is to “make the kind of remedial determination that is appropriate for a common-law tribunal, paying particular heed, however, to any special factors counselling hesitation before authorizing a new kind of federal litigation,” Wilkie, 551 U.S. at 550, 127 S.Ct. 2588 (internal quotation marks omitted), in “the absence of affirmative action by Congress,” Carlson, 446 U.S. at 18, 100 S.Ct. 1468 (quoting Bivens, 403 U.S. at 396, 91 S.Ct. 1999). The majority concludes that two factors counsel decisively against recognizing a remedy here: foreign policy and national security concerns. Maj. Op. at 425-26. Defendants have not persuasively shown that either of those factors precludes a Bivens action in the circumstances alleged here.- Moreover, there is no reason to conclude that a federal district court could not resolve whatever national security concerns might arise.
1.
The fact that the conduct Meshal complains of occurred abroad should not vitiate all remedy here. Defendants point to allegations that they harmed Meshal during an investigation “allegedly undertaken jointly with foreign government officials, and while plaintiff was detained by foreign governments.” Appellee Br. 21. It is not clear why those facts, although potentially relevant to how his lawsuit would need to be litigated and managed, see infra Part II.B.4, should foreclose the suit. United States law enforcement cooperation with foreign governments around the world has become commonplace. Defendants have not explained how litigation of Meshal’s claim would pose foreign policy difficulties. See J.A. 13-14; Oral Arg. Tr. at 30 (defendants’ counsel referring generally to “our relationship with foreign governments” as the sensitive national security issue raised by Meshal’s claims).
Our government’s power is defined and limited by the Constitution. “It can only-act in accordance with all the limitations imposed by the Constitution. When the Government reaches out to punish a citizen who is abroad, the shield which the Bill of Rights and other parts of the Constitution provide to protect his life and liberty should not be stripped away just because he happens to be in another land. This is not a novel concept. To the contrary, it is as old as government.” Reid, 354 U.S. at *441 6, 77 S.Ct. 1222. Fidelity to the Constitution should have prevented the FBI’s alleged mistreatment of Meshal in Kenya, Somalia, and Ethiopia. Judicial recognition of a claim against those nonmilitary law enforcement officers for having acted in ways long known to be contrary to the Constitution cannot fairly be condemned as “courts ... unilaterally recognizing] new limits that restrict officers’ wartime activities.” Cf. Conc. Op. at 431 (emphasis in original).
In denying Meshal a remedy under Bivens, the majority contends that the fact that Meshal’s mistreatment occurred outside the United States is a “special factor” counseling against a constitutional damages claim. See Maj. Op. at 418, 424-26; Conc. Op. at 432-33 (describing the foreign location of the alleged abuse as the “[m]ost important[ ]” factor). The court relies for support on the presumption against extraterritorial application of statutes. See Maj. Op. at 424-25 (citing Kiobel v. Royal Dutch Petroleum Co., — U.S. -, 133 S.Ct. 1659, 1664, 185 L.Ed.2d 671 (2013); Morrison v. Nat'l Australia Bank Ltd., 561 U.S. 247, 255, 130 S.Ct. 2869, 177 L.Ed.2d 535 (2010)). It is well established that Congress has the power to regulate actions of United States citizens outside the territory of the United States and, given the proliferation of transnational conduct, it increasingly does so. The presumption sets only a default rule of statutory construction to aid courts in determining whether Congress intended to legislate with respect to foreign occurrences. See Kiobel, 133 S.Ct. at 1665; Morrison, 561 U.S. at 255, 130 S.Ct. 2869. However, that presumption has no relevance to Meshal’s Bivens claims to enforce constitutional provisions that all agree apply abroad, especially given that the very genesis of Bivens lies in the acknowledged inactivity of Congress.
Even if we were to assume an analogue to the presumption against statutory extraterritoriality for Bivens claims, it would be inapposite here because the factors that animate such a presumption are absent. Entertaining Meshal’s suit poses no risk of “imposing] the sovereign will of the United States” onto conduct by foreign officials in a foreign land. Kiobel, 133 S.Ct. at 1667. Application of the United States Constitution to govern interactions between Americans would not control the subjects of an independent sovereign or clash with its law, sending the controversial message that United States law “rule[s] the world.” Cf. id. at 1664 (quoting Microsoft Corp. v. AT & T Corp., 550 U.S. 437, 454, 127 S.Ct. 1746, 167 L.Ed.2d 737 (2007)). This case involves pursuit of purely retrospective relief by our citizen under our Constitution against our government’s criminal investigators. The Supreme Court in Kiobel — a case by aliens against foreign defendants to enforce international norms — noted the inapplicability of the presumption against extraterritoriality when overseas conduct touches and concerns the United States with sufficient force. See id. at 1669; see also Morrison, 561 U.S. at 264-65, 130 S.Ct. 2869. Meshal’s claims powerfully touch and concern the United States. Defendants have failed to show that any other nation has any conflicting interest in this case or that our foreign relations would be affected were it to proceed.
Defendants relatedly assert that adjudicating Meshal’s allegations that defendants at times worked together with foreign agents to detain and transport Meshal requires federal courts to intrude on foreign justice systems and would upset diplomatic relations. Appellee Br. at 21, 24-26; see Maj. Op. at 426-27. But we have rejected the position that the cooperation of foreign law enforcement with United States agents renders a claim too sensitive to adjudicate: *442 “[Tjeaming up with foreign agents cannot exculpate officials of the United States from liability to United States citizens for the United States officials' unlawful acts.” Ramirez de Arellano v. Weinberger, 745 F.2d 1500, 1542-43 (D.C.Cir.1984) (en banc), rev’d on other grounds, 471 U.S. 1113, 105 S.Ct. 2353, 86 L.Ed.2d 255 (1985); cf. also Johnson v. Eisentrager, 339 U.S. 763, 795, 70 S.Ct. 936, 94 L.Ed. 1255 (1950) (Black, J., dissenting) (“The Court is fashioning wholly indefensible doctrine if it permits the executive'branch, by deciding where its prisoners will be tried and imprisoned, to deprive all federal courts of their power to protect against a federal executive’s illegal incarcerations.”); Abu Ali v. Ashcroft, 350 F.Supp.2d 28, 50, 54 (D.D.C.2004) (circumstances in which “a citizen is allegedly being detained at the direction of the United States in another country without any opportunity at all to vindicate his rights” amount to “an exceptional situation that demands particular attention to the rights of the citizen”). Many of the Guantanamo detainees were captured by foreign governments and handed over to the United States, yet courts regularly review the facts and circumstances of the detainees’ capture and detention when they adjudicate habeas claims. See Rasul v. Bush, 542 U.S. 466, 470-72, 483-84, 124 S.Ct. 2686, 159 L.Ed.2d 548 (2004); see, e.g., Anam v. Obama, 696 F.Supp.2d 1, 5-7 (D.D.C.2010).
Our court has identified foreign policy implications as potential “special factors” in cases involving foreign plaintiffs but has specified that such concerns are removed when the plaintiff is a United States citizen. In Doe, we acknowledged that the plaintiffs “United States citizenship does remove concerns ... about the effects that allowing a Bivens action would have on foreign affairs” even as we declined on other grounds to recognize a Bivens claim against the Secretary of Defense by a United States-citizen military contractor in Iraq. 683 F.3d at 396; cf. Sanchez-Espinoza v. Reagan, 770 F.2d 202, 208-09 (D.C.Cir.1985) (noting, in special-factors analysis of Nicaraguans’ Bivens challenge to United States’ support of the Nicaraguan Contras, the “danger of foreign citizens using the courts ... to obstruct the foreign policy of our government”).
The majority cites Munaf v. Geren, 553 U.S. 674, 702, 128 S.Ct. 2207, 171 L.Ed.2d 1 (2008), for the broad proposition that United States courts may not “second guess executive officials operating in foreign justice systems,” Maj. Op. at 426, but that case does not support defendants’ foreign-policy objection to Meshal’s Bivens claims. The Court in Munaf unanimously held that United States citizens held by multinational forces have a right to seek habeas corpus relief in United States courts, 553 U.S. at 686-88, 128 S.Ct. 2207, notwithstanding that the participation of cooperating foreigners in the circumstances of confinement might be exposed. Munaf also concerned a contest over which of two sovereigns should prosecute criminal suspects of interest to both — a contest absent here, where no prosecution occurred and no other sovereign has claimed an interest in Meshal’s civil case. See id. at 697-98, 128 S.Ct. 2207. The Supreme Court’s conclusion — that the United States government’s decision not to “shelter [American] fugitives from the criminal justice system of the sovereign with authority to prosecute them” was beyond judicial review, id. at 705, 128 S.Ct. 2207 — has no relevance here. It fails to provide even indirect support for defendants’ much broader contention that a “foreign policy” factor weighs against any adjudication of rights abuses arising from investigations involving international cooperation.
*443 2.
Defendants also have not shown how the “special factor” of national security prevents recognition of a Bivens claim here. See Oral Arg. Tr. at 23 (defendants’ counsel claiming that it “is the mere .prospect of [national security related] litigation inquiry that raises” national security sensitivities). The executive and legislative branches have primary authority over national security matters, but their authority is not entirely insulated from the courts, which play a vital role in protecting constitutional rights. The Supreme Court has long “made clear that a state of war is not a blank check for the President when it comes to the rights of the Nation’s citizens,” and underscored that, “[w]hatever power the United States Constitution envisions for the Executive in its exchanges with other nations or with enemy organizations in times of conflict, it most assuredly envisions a role for all three branches when individual liberties are at stake.” Hamdi, 542 U.S. at 536, 124 S.Ct. 2633. Because “[n]ational security tasks ... are carried out in secret ..., it is far more likely that actual abuses will go uncovered than that fancied abuses will give rise to unfounded and burdensome litigation.” Mitchell v. Forsyth, 472 U.S. 511, 522, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985). Courts must take care in accepting assertions of necessity based on national security, because, as the Supreme Court has observed, “the label of ‘national security’ may cover a multitude of sins.” Id. at 524, 105 S.Ct. 2806.
The law enforcement investigations in Turkmen v. Hasty, 789 F.3d 218 (2d Cir.2015), were at least as related to the investigation of suspected terrorism as the investigation at issue here, but the Second Circuit found no bar to Bivens claims. See id. at 233-37. The Turkmen plaintiffs were detained in the wake of the September 11th attacks and held until the government could clear them of any involvement with terrorism. Id. at 226-27. The fact that the investigation concerned terrorism did not preclude the court from recognizing a Bivens remedy. The court acknowledged that “[i]t might well be that national security concerns motivated the Defendants to take action, but that is of little solace to those who felt the brunt of that decision. The suffering endured by those who were imprisoned merely because they were caught up in the hysteria of the days immediately following 9/11 is not without a remedy.” Id. at 264. The national security character of the investigation was not dispositive there, nor should it be here.
I appreciate the majority’s efforts to cabin its holding to cases touching on national security and arising abroad. See Maj. Op. at 418, 425-26; see also Oral Arg. Tr. at 28, 30 (government disclaiming any .rule barring all Bivens claims involving counter-terrorism investigations, or all claims based on overseas conduct). But I fear that relying on general national security concerns unconnected to military operations goes too far toward eliminating Bivens altogether. On its own, national security is a malleable concept. According to one scholar who exhaustively canvassed the field, “[d]espite its appearance throughout history and its use in relation to statutory authorities ... ‘national security’ is rarely defined,” and when Congress and the executive branch define it, they do so broadly; the Supreme Court, for its part, “has acknowledged that the term is frustratingly broad, [and that it gives] rise to important constitutional concerns.” Laura K. Donohue, The Limits of National Security, 48 AM. CRIM. L. REV. 1573, 1579-84 (2011). Defendants provide no principle limiting their proffered “national security” rationale for defeating Bivens liability and shielding federal agents from constitutional accountability. The bound *444 lessness of their position is particularly problematic when “[n]o end is in sight” to the war against terrorism. Cone. Op. at 431. Defendants’ open-ended invocation of “national security” to defeat Bivens is unprecedented.
All of the cases defendants cite as dismissing Bivens claims for national security reasons are readily distinguishable from this one as involving the military. See Doe, 683 F.3d 390; Vance, 701 F.3d 193; Lebron, 670 F.3d 540. Both Doe and Vance concerned abuses allegedly committed by military officials and challenged military decisions about operations in the theater of war. Doe, 683 F.3d at 392; Vance, 701 F.3d at 195-96, 199. Those decisions hinged, in part, on the fact that the plaintiffs were the functional equivalent of members of the armed services. For example, plaintiff Doe was a defense contractor detailed to a Marine unit on the Iraqi-Syrian border who was detained by the military and determined by a Detainee Status Board to be a threat to the MultiNational Forces in Iraq. See Doe, 683 F.3d at 391-92. Although Doe was “a contractor and not an actual member of the military,” we saw “no way in which this affects the special factors analysis” of Stanley and Chappell, which was based on the exclusive system of military justice and discipline. See Doe, 683 F.3d at 393-94. Notably, in Doe, we referred' collectively to the “military, intelligence, and national security” aspect of the case, never invoking “national security” alone or as it might relate to a criminal investigation. Id. at 394. Vance, too, involved claims of military contractors “performing much the same role as soldiers.” 701 F.3d at 198-99. They were detained by military personnel in a combat zone on suspicion of supplying weapons to groups opposed to the United States. The Seventh Circuit refused to recognize a Bivens remedy for their claims, reasoning that “[t]he Supreme Court’s principal point was- that civilian courts should not interfere with the military chain of command.” Id. at 199.
In Lebrón, plaintiff Jose Padilla was “convicted of conspiring with others within the United States to support al Qaeda’s global campaign of terror” before he sued military policymakers and military officers for his prior military detention as an enemy combatant. 670 F.3d at 544. Although Padilla was neither a service member nor a contractor functioning as one, the defect in his suit, as in Doe and Vance, was that he sued the military and his claims threatened to “interfere[ ] with military and intelligence operations on a wide scale.” Id. at 553.
Meshal’s suit does not arise out of or seek to scrutinize military service or military activity — he is not a service member or military contractor nor is he challenging any conduct of military officials. He was detained by FBI agents during the course of a national-security related law enforcement operation. Unlike its treatment of Bivens claims arising from and challenging military actions, the Supreme Court has never hesitated to recognize the viability of a damages suit against federal agents engaged in law enforcement activities or responsible for supervising prisoners. Compare Chappell, 462 U.S. at 300, 103 S.Ct. 2362, with Bivens, 403 U.S. at 397-98, 91 S.Ct. 1999, and Carlson, 446 U.S. at 17-19, 100 S.Ct. 1468.
3.
Even accepting that the intersection of foreign policy and national security concerns might sometimes amount to “special factors” counseling decisively against a Bivens claim, defendants have failed utterly to explain why those factors should be dispositive here. Defendants’ contention that litigating Meshal’s claims could jeop *445 ardize national security has been made in a cursory fashion, and only in legal briefing. Defendants repeatedly assert, for example, that Meshal’s suit would “enmesh the judiciary in the evaluation of national security threats in the Horn of Africa region” arid compromise “the substance and sources of intelligence.” Appellee Br. 13, 24, 25, 37. That is insufficient. The scope or urgency of the national security threat in the Horn of Africa has not been shown to be incompatible with remedying violations of Americans’ Fourth and Fifth Amendment rights.
The government’s assertion of national security interests here is quite different from the assertion that persuaded the Fourth Circuit in Lebrón to decline to recognize a Bivens claim. There, the court noted that Congress and the executive had acted in concert in support of the power over military affairs that constituted a “special factor.” Lebron, 670 F.3d at 549. Congress enacted the Authorization for the Use of Military Force, and the President formally designated Padilla as an enemy combatant pursuant to that authorization. Id. Here, no designation was made, and no military power asserted. The concurrence characterizes FBI activities in foreign countries as part of an “integrated war effort” under the national security umbrella of the President’s war power, and suggests that defendants were privileged to act as they did because they “suspected that Meshal was an al Qaeda terrorist.” Cone. Op. at 431. But defendants do not claim that they acted pursuant to presidential war powers, nor have they provided any grounds for treating Meshal as a terrorist.
If Article III judges must sometimes cede our rights-proteetive role in deference to the political branches on matters of national security, we should do so only with a responsible official’s authoritative and specific assurance of the imperative of doing so. “[Hjistory and common sense teach us that an unchecked system of detention carries the potential to become a means for oppression and abuse.... ” Hamdi, 542 U.S. at 530, 124 S.Ct. 2633. Not every Justice Department lawyer assigned to represent individual defendants sued under Bivens, see 28 C.F.R. § 50.15, has the authority to invoke the prerogatives of the Commander in Chief.
Before declining to recognize a cause of action because of national security concerns, the court should require the government to provide a concrete, plausible, and authoritative explanation as to why the suit implicates national security concerns. That judges cannot “forecast” on our own whether or how this suit might affect national security, see Maj. Op. at 426, only underscores why we must require that the government take responsibility for invoking any such rationale. If this ease indeed raises national security concerns, our law provides the United States with the opportunity to advance them, and gives courts more nuanced and focused ways to address such concerns.
In order to invoke the state secrets evi-dentiary privilege, for example, the head of the department with control over a matter must personally consider the issue and make a formal claim of privilege. United States v. Reynolds, 345 U.S. 1, 7-8, 73 S.Ct. 528, 97 L.Ed. 727 (1953). Courts give careful scrutiny to such assertions. See, e.g., Ah-Haramain Islamic Found., Inc. v. Bush, 507 F.3d 1190, 1203 (9th Cir.2007) (“Simply saying ‘military secret,’ ‘national security’ or ‘terrorist threat’ or invoking an ethereal fear that disclosure will threaten our nation is insufficient to support the privilege. Sufficient detail must be — and has been — provided for us to make a meaningful examination.”). Here, by contrast, defendants have provid *446 ed no affidavit or certification from a high-level government official explaining how Meshal’s suit would implicate national security. Defendants’ broad claim that this case implicates national security is entirely unsupported and conjectural. It does not justify refusing to recognize a Bivens claim here.
4.
If Meshal were permitted to press his claim, it is entirely possible that during the proceedings a national-security related issue would arise, and that such an issue might prove to be an obstacle to the suit. But that is no reason to halt his suit at the threshold. As the majority notes, Maj. Op. at 425, defendants’ counsel at argument was unable to explain how litigating Meshal’s claim might reveal national security information or be insusceptible of management through the many other doctrines designed to enable litigation consistent with national security interests. See Oral Arg. Tr. at 23, 25.
Federal courts frequently decide cases raising national security issues and are well equipped to handle them. Among the responsibilities of Article III courts is the duty to evaluate the factual and legal bases of the government’s detention of United States citizens designated as enemy combatants, Hamdi, 542 U.S. at 509, 536, 124 S.Ct. 2633, to adjudicate habeas petitions brought by enemy combatants detained at Guantanamo Bay, Boumediene v. Bush, 553 U.S. 723, 732, 128 S.Ct. 2229, 171 L.Ed.2d 41 (2008), and to decide whether federal agents were engaged in a “joint venture” with foreign law enforcement officials to circumvent Miranda warnings, United States v. Abu Ali, 528 F.3d 210, 226-28 (4th Cir.2008). The judiciary has a wide range of tools to address national security concerns as they arise during the course of a lawsuit. In light of those tools, defendants have failed to show that there is a reason to deny categorically Meshal’s constitutional tort claims.
Under the state-secrets privilege, for example, the government can withhold information from discovery if disclosure of that information would imperil national security or foreign policy. See, e.g., Reynolds, 345 U.S. at 7-8, 73 S.Ct. 528; Halkin v. Helms, 690 F.2d 977, 990 (D.C.Cir.1982). Once the government properly invokes the privilege, a plaintiff cannot defeat it even if his suit would fail without the privileged material. See, e.g., Reynolds, 345 U.S. at 11, 73 S.Ct. 528; Halkin, 690 F.2d at 990. The state-secrets privilege is designed precisely to prevent disclosure of information that would impair the nation’s defense capabilities or diplomatic interests.
Courts have developed a variety of additional procedures for managing cases that implicate sensitive issues. See Federal Judicial Center, National Security Case Studies: Special Case-Management Challenges (June 25, 2013) (hereinafter “FJC”). Courts are equipped to evaluate classified and sensitive evidence while maintaining secrecy. Classified or secret evidence is often submitted to courts under seal, and courts can issue opinions without disclosing that evidence. See, e.g., Nat’l Council of Resistance of Iran v. Dep’t of State, 251 F.3d 192, 202 (D.C.Cir.2001) (“We acknowledge that in reviewing the whole record, we have included the classified material. As we noted above ... we will not' and cannot disclose the contents of the record.”); U.S. Info. Agency v. Krc, 989 F.2d 1211, 1220 n. 4 (D.C.Cir.1993) (“[Secret] information has been submitted to the court under seal and cannot be discussed in this opinion.”). Court personnel and non-government attorneys may be eligible for security clearances that permit them to view and use classified documents and materials for purposes of litigating claims touching on national security. See, *447 e.g., In re Nat'l Sec. Agency Telecomms. Records Litig., 595 F.Supp.2d 1077, 1089 (N.D.Cal.2009); see also United States v. Moussaoui, 591 F.3d 263, 267 (4th Cir.2010); FJC at 416, 422 (collecting examples). Courts can assign codes or aliases in a case to enable witnesses to testify about secret matters in a way in which the judge, jury, and attorneys will understand, but the public will not. See FJC at 407-08. Secure video connections can enable depositions and recorded testimony from witnesses living abroad. FJC at 64, 130-31, 187. Defendants have given no reason to believe that the tools available to courts to respond to such concerns would be inadequate in Meshal’s case.
Constitutional damages remedies hold out hope of redress to survivors of what is sometimes truly horrific abuse at the hands of government agents. Witness this case. Such claims are rarely brought and, due to legal and factual complexities, they almost never succeed. Yet their existence has enormous value. As Judge Easter-brook observed for the en banc Seventh Circuit in Vance, “[pjeople able to exert domination over others often abuse that power; it is a part of human nature that is very difficult to control.” 701 F.3d at 205. The Supreme Court recognized constitutional torts to deter that kind of abuse of power. United States law enforcement is more active internationally today than ever before, increasing the relevance of Bivens’ remedial and deterrent functions in cases like this one. Because I do not believe that precedent supports eliminating Meshal’s suit or that defendants made a showing that any congressional action or special factors should preclude it, I respectfully dissent.

. Damages are the traditional remedy at law, Bivens, 403 U.S. at 395, 91 S.Ct. 1999, and are less intrusive and thus more readily reconciled with national security prerogatives than an injunction disrupting ongoing official activities. Cf. Women Prisoners of D.C. Dep’t of Corr. v. District of Columbia, 93 F.3d 910, 921-22 (D.C.Cir.1996) (injunctive relief "was never regarded as relief of first resort” because, "in tort actions, the standard formulation of the common law ... is that equitable relief, such as an injunction, will be granted only when plaintiff's legal remedies are inadequate”).

. In the Detainee Treatment Act of 2005, Congress enacted a limited, good-faith immunity provision shielding United States agents from damages liability in lawsuits brought by alien detainees. See 42 U.S.C. § 2000dd-1(a). Such immunity further hints that Congress contemplated that United States agents would face some kind of liability in United States courts when they mistreat their own citizens. See Vance, 701 F.3d at 219-20 (Hamilton, J., , dissenting).

. See Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, art. 2(1), Dec. 10, 1984, S. Treaty Doc. 100-20 (1988), 1465 U.N.T.S. 85 ("Each State Party shall take effective legislative, administrative, judicial or other measures to prevent acts of torture in any territory under its jurisdiction.”); Comm, against Torture, General Comment No. 2 on Implementation of Article 2 by States Parties, U.N. Doc. CAT/C/GC/2, at ¶ 16 (Jan. 24, 2008) (construing "any territory” language in Convention *439 Against Torture to include "other areas over which a State exercises factual or effective control”); International Covenant on Civil and Political Rights, art. 7, Dec. 16, 1966, S. Exec. Doc. C, D, E, F, 95-2 (1978), 999 U.N.T.S. 171 (“No one shall be subjected to torture or to cruel, inhuman or degrading treatment or punishment.”); Geneva Convention Relative to the Protection of Civilian Persons in Time of War, arts. 3, 32, 147, Aug. 12, 1949, 75 U.N.T.S. 287 (prohibiting cruel and inhuman treatment and torture).

. Comm. Against Torture, Concluding Observations on the Third to Fifth Periodic Reports of United States of America, U.N. Doc. CAT/C/ USA/CO/3-5 (Nov. 20, 2014), at ¶¶ 5, 10, 14 (noting United States official policy that "U.S. personnel are legally prohibited” under Convention "from engaging in torture or cruel, inhuman” treatment "at all times, and in all places”); see also CAT, art. 2(1); ICCPR, art. 7; Legal Consequences of the Construction of a Wall in the Occupied Palestinian Territory, 2004 I.C.J. 136, ¶ 109 (2004); Human Rights Comm., General Comment No. 31 on the Nature of the General Legal Obligation Imposed on State Parties to the Covenant, U.N. Doc CCPR/C/21/Rev. 1/Add. 13, ¶ 10 (May 26, 2004).

. Convention Against Torture, art. 14(1); ICCPR, arts. 2(3), 9(5), 14(6).