In the

# United States Court of Appeals

### For the Seventh Circuit

---

No. 15-1497

ESTATE OF WILLIAM A. MILLER, by its representatives Patrick
T. Chassie and Linda Wilkerson,

*Plaintiff-Appellant,*

*v.*

HELEN J. MARBERRY and GARY ROGERS,

*Defendants-Appellees.*

---

Appeal from the United States District Court for the
Southern District of Indiana, Terre Haute Division.
No. 2:11-cv-262-JMS-DKL — **Jane Magnus-Stinson**, *Chief Judge.*

---

ARGUED NOVEMBER 29, 2016 — DECIDED JANUARY 30, 2017

---

Before POSNER, EASTERBROOK, and SYKES, *Circuit Judges.*

EASTERBROOK, *Circuit Judge.* While confined at the federal
prison in Terre Haute, Indiana, William Miller fell out of an
upper bunk and broke his back. Contending that he should
have been in a lower bunk, Miller seeks compensation in this
*Bivens* action. Miller died in June 2016; the record does not
show why. His estate has been substituted as the plaintiff,
but we use his name to make the exposition easier to follow.

Miller's principal problem is the identity of the two defendants: Gary Rogers, a guard, and Helen Marberry, then the Warden of Terre Haute. Miller does not seek relief from any physician or nurse, even though the prison's medical department is responsible for deciding who has a medical need for a lower bunk. (His complaint named nurse Trisha Haddix, but he has abandoned that claim.) Nor did Miller sue the guard responsible for making bunk assignments. That guard sits in a pod containing a computer with access to the prison's SENTRY database that identifies medical restrictions. Rogers, by contrast, roamed the cells on foot.

The events underlying this suit began on January 6, 2009, when Miller was moved from the prison's general population to the more restrictive "special housing unit" and assigned to an upper bunk. Miller contends, and we assume, that when Rogers made his rounds later that day Miller told Rogers that he had a brain tumor and was entitled to a lower bunk. Rogers replied that Miller must follow his assignment or be put on report for disobedience.

Five days later Miller fell from the ladder between the upper bunk and the floor. He hit his head and lost consciousness. Miller does not contend that Rogers (who apparently was not working that shift) or anyone else responded inadequately. Miller was carried on a backboard with a cervical collar to an examination room, where a nurse noted that he reported pain in his neck, back, and left foot. He was transported by ambulance to a hospital's emergency room. The hospital conducted a CT scan that did not detect any fall-related problems. Miller returned to the prison within a few hours and was again assigned to an upper bunk. He does not contend that either Rogers or Marberry played a role in that assignment. Nor does he contend that any of the

many medical personnel he saw that day issued, or should have issued, a lower-bunk-only directive. He does not contend that he then (or ever) went to the guard responsible for bunk assignments and either asked for a lower bunk or told that guard that he had a medical pass for one. He does say, however, that once he had retuned to the special housing unit he told Rogers that he had fallen and repeatedly asked him for a lower bunk, and that Rogers did not respond.

On February 14, 2009, Miller rolled over while asleep in the upper bunk and fell approximately six feet to the cement floor. This time he broke his back and suffered other serious injuries. Once again Miller does not contend that the care he received was substandard. He was carried on a backboard, with a cervical collar, to a hospital for a CT scan, which revealed injuries that led to surgery. When he returned to the prison he was *again* placed in an upper bunk, where he remained until December 1, 2009, when the medical staff directed that he be assigned to a lower bunk. Miller does not contend that Rogers played any role in his assignment to an upper bunk between his return from the hospital and December 1—nor does he contend that any of the prison's medical staff is liable for failing to ensure that he had a lower bunk then, or earlier. Finally, Miller does not contend that either Rogers or Marberry is liable for failing to ensure that upper bunks have railings, nets, or other devices to prevent inmates from falling out while asleep.

The district court granted summary judgment to Rogers and Marberry, giving two principal reasons. The first, to which we have alluded, is that neither Rogers nor Marberry was responsible for bunk assignments. The second is that if Rogers had consulted the SENTRY database he would not have discovered a lower-bunk directive. The district judge

found it uncontested that an earlier pass had expired and that a new one was not issued until December 1, 2009. The judge stated that guards and wardens are entitled to rely on the medical staff to make medical decisions about medical problems.

Miller sees this second reason as his opening. He contends that there is a material dispute about what Rogers would have found had he consulted the SENTRY database. When denying a post-fall grievance about his bunk assignment, Warden Marberry wrote that Miller had had authorization for a lower bunk since early 2008 and should have brought this to the attention of the guard responsible for placement decisions (that is, the guard in the pod). Miller observes that this contradicts affidavits filed by Rogers and others relating that in January and February 2009 the SENTRY database did not contain a lower-bunk notation. Both statements could be correct; a lower-bunk assignment may have been issued but not added to the database. But there is still an apparent inconsistency, and Miller maintains that this requires a trial.

Yet the first problem remains—Miller has not sued the people responsible for bunk assignments. Miller supposes that it is enough to tell someone about a problem; anyone told must fix the problem, he insists. He told Rogers that he had a brain tumor and a lower-bunk assignment, and Rogers did nothing. He maintains that, while Marberry was walking through the special housing unit, he tried to tell her too, though she turned her back and left before he was finished. That makes her as much responsible as Rogers, Miller believes.

That line of argument is deficient on multiple levels. One is that it supposes that every federal employee is responsible, on pain of damages, for not implementing the decision of any other federal employee, so that all Miller need show is the existence of a lower-bunk order. Yet the Supreme Court has never held that *Bivens* actions can be used to enforce administrative orders. Nor has the Court held that every public official has a duty to carry out every other public official's decisions. To the contrary, *Castle Rock v. Gonzales*, 545 U.S. 748 (2005), holds that police and prosecutors are not liable for their failure to enforce a judicial no-contact order. Why would a lower-bunk permit receive greater status? To get anywhere, Miller needed to establish that Rogers and Marberry violated his constitutional rights—which for a medical claim under the Eighth Amendment means knowing of (or being deliberately indifferent to) a serious medical condition, then not taking minimally competent steps to deal with that condition. See *Estelle v. Gamble*, 429 U.S. 97 (1976); *Farmer v. Brennan*, 511 U.S. 825 (1994); *Petties v. Carter*, 836 F.3d 722 (7th Cir. 2016) (en banc).

A lower-bunk permit does not supplant that framework for Eighth Amendment claims. Miller does not contend that the very existence of a lower-bunk assignment would convey to any conscientious prison employee the existence of a serious medical condition, something that is a *sine qua non* of an Eighth Amendment medical-care claim. For all this record shows, medical personnel issue lower-bunk directives for reasons that do not imply the existence of a "serious" health problem; Miller did not ask in discovery for the criteria that the prison uses to issue lower-bunk directives.

His statement to Rogers that he had a brain tumor likewise falls short of demonstrating a serious medical condi-

tion. Brain tumors come in many sizes and locations; they have a range of effects, including none; benign tumors can last decades without causing adverse consequences. So to say "I have a brain tumor" would not necessarily imply to every guard or warden the need for medical care, let alone the particular accommodation (a lower bunk) that Miller demanded. What's more, Rogers was not obliged to believe Miller's assertion that he had a brain tumor and a lower-bunk pass. Prisoners can be manipulative, using deceit to obtain advantages; guards are accordingly entitled to be skeptical. *Riccardo v. Rausch*, 375 F.3d 521, 525 (7th Cir. 2004).

Prisons respond to the risk of manipulative conduct by exploiting the division of labor—for example, by allocating bunk-assignment duties to guards who have computer terminals that enable them to check prisoners' assertions. Miller made his assertions about a brain tumor and a lower-bunk pass to Rogers, who could not verify them, while never complaining to the guard with bunk-assigning duties and access to the SENTRY database. This record shows that Miller *did* have a thalamic brain tumor, diagnosed before he entered prison, that reduced sensation on the left side of his body. A lower-bunk assignment may have been well justified, but neither Rogers nor Marberry knew the details, consequences, and appropriate accommodations of Miller's medical condition.

Liability under *Bivens* is personal rather than vicarious. See, e.g., *Iqbal v. Ashcroft*, 556 U.S. 662, 677 (2009); *Vance v. Rumsfeld*, 701 F.3d 193, 203–05 (7th Cir. 2012) (en banc). One consequence of this rule was spelled out in *Burks v. Raemisch*, 555 F.3d 592 (7th Cir. 2009), which holds that prison officials who reject prisoners' grievances do not become liable just because they fail to ensure adequate remedies. That's a fair

description of Rogers's and Marberry's situations. Indeed, Rogers did not have any grievance-adjustment responsibilities, and Marberry, who was the ultimate grievance adjuster, did not receive a formal grievance from Miller until 18 months after his second fall. Defendants' brief in this court relies on *Burks* and two similar decisions, *Arnett v. Webster*, 658 F.3d 742, 755 (7th Cir. 2011), and *King v. Kramer*, 680 F.3d 1013, 1018 (7th Cir. 2012), but Miller's briefs do not discuss any of the three.

Although *Iqbal*, *Vance*, and *Burks* all hold that inaction following receipt of a complaint about someone else's conduct is not a source of liability, Miller seeks support from *Haywood v. Hathaway*, 842 F.3d 1026 (7th Cir. 2016), in which the majority of a divided panel thought that allegations against a state prison's warden created a triable Eighth Amendment issue. Haywood contended that he had been held for 60 days in freezing conditions. The panel's majority stressed that the warden had given instructions to the prison's engineering staff, received a report, visited the scene, and declared that all was well. That personal involvement permitted an inference that the warden's own conduct was unconstitutional. Miller's allegation, by contrast, is that Rogers and Marberry brushed off his complaints, leaving them to be handled through the chain of command. That brings Miller's claim within the scope of *Iqbal*, *Vance*, and *Burks* rather than *Haywood*.

AFFIRMED

POSNER, *Circuit Judge*, dissenting. In November 2006 William Miller was convicted of bank robbery and sentenced to 120 months in prison. Between then and his imprisonment, which began thirteen months later in the Federal Correctional Complex in Terre Haute, Indiana ("FCC Terre Haute" as the prison is more commonly known), he was diagnosed with a thalamic brain tumor (more commonly referred to in the medical profession as a thalamic glioma) that impaired the feeling in the left side of his body—a typical symptom of the disease.

A month after entering prison, Miller was given a "lower-bunk restriction": his doctor ordered that he be assigned to a lower bunk because of his medical condition, and a notation to that effect was added (or should have been added) to his profile in the prison's electronic record-keeping system. A year later, for unknown reasons (but there is no indication that the reasons were disciplinary), he was assigned to a more restrictive housing unit in the prison than he'd originally been in, called the Special Housing Unit. He was initially given a lower bunk, but within hours was moved to an upper one. He complained to Gary Rogers, the number one guard in the unit, that because of his brain tumor he had a lower-bunk restriction, but Rogers told him he wouldn't be switched to a lower bunk and if he refused the upper bunk he would "receive a disciplinary report for refusing a direct order."

Yet just five days after this contretemps, climbing down the ladder from his upper bunk Miller became dizzy, slipped, and fell to the concrete floor, hitting his head and losing consciousness. According to the prison's report of the incident, Miller was found "lying in [on?] [the] floor of [his] cell at [the] bottom of [the] bunk stairs" with "blood noted to

[at?] top of head with a small … laceration." He was taken to a hospital, treated, and given a CAT scan, but upon his return to the prison was again assigned an upper bunk. He complained about the assignment, without effect, both to Rogers and to an attending nurse.

At about this time the prison's warden, defendant Marberry, on one of her weekly walks through the Special Housing Unit, stopped at the door to Miller's cell, and he told her he'd recently fallen from the upper bunk and should be placed in a lower bunk. As warden she could of course have taken up the issue of lower versus upper bunk for Miller with the prison's medical staff, but she didn't; she merely "walked away from [Miller's] cell door leaving him in midspeech" (according to the complaint)—and this despite the fact that before he entered the Special Housing Unit, Miller had repeatedly discussed his brain tumor with the warden on her visits to prisoners during their lunch period.

The following month (February 2009) Miller while sleeping fell from his upper bunk at about 2:30 a.m. and remained lying on the floor for an hour or two until noticed by staff, who placed him on a back board with a cervical collar around his neck and took him to the emergency room of a nearby hospital, where a CAT scan revealed that Miller had severely compacted (that is, compressed) the cervical segment of his spine and sustained a fracture in the thoracic region. He was placed in a hard clamshell back brace.

Upon his return to the prison so accoutered, he again requested a lower-bunk assignment and it was again refused without reasons given. Warden Marberry walked through the Special Housing Unit many times in 2009 and saw Miller lying on the upper bunk in his cell wearing his clamshell

back brace and a cervical brace. Each time she approached his cell he asked her for a lower bunk, but she did nothing in response to his request; and Rogers, who in making his rounds also saw Miller frequently, also did nothing. Throughout this period Miller was in acute pain.

Finally on December 1, 2009, Miller was given a new lower-bunk restriction for one year. Eleven days later, however, the day after a nurse removed surgical staples in Miller's back that had been placed there during his most recent surgery, the wound that had been stapled burst open, discharging a large amount of a yellowish fluid consisting mainly of blood. He was taken to a hospital and remained there for four months until the wound healed. It appears that after returning from the hospital Miller was at last given a lower-bunk assignment.

Miller filed an administrative complaint with the prison the following year, complaining about all the time he'd been made to sleep in an upper bunk despite its serious consequences for his health. His complaint was denied on the ground that—although he'd had a lower-bunk restriction since January 29, 2008—he had never submitted a document confirming that restriction to a member of the prison's staff, as required by a notice to the prisoners that "It is your responsibility to have all medical restrictions on your person to present to staff." Although he'd had a lower-bunk restriction since January 29, 2008, he had lost the document confirming the restriction and had been unable to obtain a new one from the prison's medical staff until well into the following year.

He continued complaining about having to sleep in an upper bunk, all to no avail, and culminating in this remark-

able brush-off by the Federal Bureau of Prisons Office of Regional Counsel: an "investigation of your claim did not reveal you suffered any personal injury as a result of the negligent acts or omissions of Bureau of Prisons employees acting within the scope of their employment." In fact he had suffered severe injuries as a result of the negligence—indeed the deliberate indifference—of Rogers and Marberry, both of whom were aware of his problems, could not have failed to realize that they had resulted from his being sentenced to an upper bunk, and could readily have alerted the prison's medical and administrative staff to the need to give him a lower bunk. They did nothing. That's what's called deliberate (that is, knowing) indifference to a serious medical need.

Judge Easterbrook's majority opinion speculates that medical personnel might issue lower-bunk restrictions for reasons that don't imply the existence of a serious medical need; points out that not all brain tumors are serious; and reminds the reader that guards are not obliged to believe whatever a prisoner tells them. All true—but whether Rogers or Marberry was aware of the serious health risk to Miller from being assigned to an upper bunk is an open question that needs to be addressed at a trial. The record contains facts that support Miller's claim that he had a serious medical need and that the defendants knew it and did nothing despite their responsibilities.

His administrative claims denied, Miller brought this civil suit pro se against Rogers, Marberry, and a nurse named Haddix (whom we can ignore however because there is no evidence that she neglected any of Miller's needs), charging them with deliberate indifference to his medical problems in violation of the Eighth Amendment. The district judge granted summary judgment in favor of the defend-

ants, however, mainly on the basis of the defendants' claim that Miller was not listed in the prison's electronic database as having a lower-bunk restriction. This as I'll show is almost certainly incorrect.

He appealed to our court, again pro se, but while the appeal was pending the court recruited counsel for Miller and struck all the briefs that had been filed thus far with the court. Four months later Miller died, causes unknown—so far as appears no autopsy was performed. Miller's lawyer was permitted to substitute Miller's estate as the appellant, and the appeal was argued to this panel on November 29 of last year.

Now it's true that Rogers and Marberry, not being medical personnel, were entitled to "rely on the expertise of medical personnel," *Arnett v. Webster*, 658 F.3d 742, 755 (7th Cir. 2011), but nonmedical prison personnel "cannot [be permitted to] simply ignore an inmate's plight" of which they're aware, *id.*—which a jury could well find was what happened in this case. The defendants knew after Miller's first fall from an upper bunk, and from his complaints to both of them, that he was in danger of a serious injury if he remained in an upper bunk, and it would been the simplest thing in the world for either or both of them to have conveyed his complaints to the prison's medical staff for confirmation of whether he already had, and if not should be given, a lower-bunk restriction.

Warden Marberry's reactions to Miller's complaints made to her repeatedly in person as she made her rounds through the Special Housing Unit were grossly insensitive—so callous that they could have been expected to cost her her job. All she would have had to do in response to Miller's

complaints was alert the prison's medical staff to them; the staff would have responded with alacrity to a directive *by the warden* to determine whether Miller should be given (or indeed already had, as indeed he did have after January 2008) a lower-bunk restriction. It would have taken her no time, no effort, and no detailed knowledge of Miller's condition to respond intelligently to his repeated and plausible complaints (plausible given his brain tumor and his falls from the upper bunk). After his first fall, and certainly after his second, it must have been obvious to Marberry and Rogers and any other prison personnel who knew of Miller's condition that he should not be consigned to an upper bunk.

And finally we know that Miller had been given a lower-bunk restriction in January 2008, before both of his falls from his upper bunk, which occurred early the following year; he just didn't have a paper copy of it and so couldn't prove to Rogers' satisfaction that he had such a restriction. Warden Marberry confirmed in writing that Miller had been given the restriction then and that it was recorded in the prison's database. As a defendant's statement against interest, that confirmation was sufficient to create a factual dispute that could not be resolved by the district judge on summary judgment. The contrary evidence was in fact weak, for remember that it was the warden who said that Miller had had a lower-bunk restriction since January 2008; and Rogers testified weakly that "it would have been" his practice to rely on the number two officer in the Special Housing Unit to check the database if an inmate complained that he had a bunk restriction that wasn't being honored. And more weakly still: "I vaguely remember this inmate [Miller] and do not specifically recall what his medical issues were or may have been on January 6, 2009."

Marberry also pleaded forgetfulness. She claimed no recollection of what if anything she'd done in response to Miller's repeated complaints about being denied a lower bunk. (Obviously, nothing.) No defendant has argued that all the lower bunks were filled by inmates who, like Miller, could not be safely assigned to upper bunks, so that there was no room for him. Most important, there is no evidence that anyone checked the database to see whether, as Miller repeatedly said, he had a lower-bunk restriction.

The insouciance of Rogers and Marberry is remarkable, as well as deplorable, when one recalls that both knew about Miller's brain tumor, about his wanting a lower bunk for medical reasons, and about at least his first fall from the upper bunk and his resulting hospitalization. (Almost certainly they knew of the second fall as well.) True, Rogers is just a guard, but as we said in *Dobbey v. Mitchell-Lawshea*, 806 F.3d 938, 941 (7th Cir. 2015), "prison guards have a responsibility for prisoners' welfare. If a prisoner is writhing in agony, the guard cannot ignore him on the ground of not being a doctor; he has to make an effort to find a doctor, or in this case a dentist, or a technician, or a pharmacist—*some* medical professional." See also *Smego v. Mitchell*, 723 F.3d 752, 757 (7th Cir. 2013). If that's true of a mere guard, it is *a fortiori* true of a warden who knows that a prisoner's potentially very dangerous health condition is being ignored by the prison's guards and medical staff that she—the warden—supervises.

I note that the Bureau of Prisons is required by law to "provide suitable quarters and provide for the safekeeping, care, and subsistence of all persons charged with or convicted of offenses against the United States … ." 18 U.S.C. § 4042(a)(2). The Bureau failed in this case. Quarters with an upper-bunk assignment are not suitable for someone with

the kind of brain tumor that Miller had; he was denied both safekeeping and care. This is a classic case of turning a blind eye to "a substantial risk of serious harm to a prisoner." *Perez v. Fenoglio*, 792 F.3d 768, 781 (7th Cir. 2015).

Judge Easterbrook's opinion cites *Ashcroft v. Iqbal*, 556 U.S. 662, 677 (2009), for its rejection of a theory of "supervisory liability" that would make supervisors liable for "knowledge and acquiescence in their subordinates' use of discriminatory criteria to make classification decisions among detainees." The Court in *Iqbal* thus rejected the proposition that a supervisor's mere knowledge of a subordinate's discriminatory purpose amounts to the supervisor's violating the Constitution. "[P]etitioners may not be held accountable for the misdeeds of their agents. … Absent vicarious liability, each Government official, his or her title notwithstanding, is only liable for his or her own misconduct. In the context of determining whether there is a violation of a clearly established right to overcome qualified immunity, purpose rather than knowledge is required to impose … liability on the subordinate for unconstitutional discrimination; the same holds true for an official charged with violations arising from his or her superintendent responsibilities." *Id.*

I have no quarrel with that. But knowledge and duty can be entwined. "A prison official's knowledge of prison conditions learned from an inmate's communications can, under some circumstances, constitute sufficient knowledge of the conditions to require the officer to exercise his or her authority and to take the needed action to investigate and, if necessary, to rectify the offending condition." *Vance v. Peters*, 97 F.3d 987, 993 (7th Cir. 1996). Both Rogers and Marberry were responsible for the safety of prison inmates and were on notice that Miller's safety was jeopardized as a consequence of

confining him to an upper bunk. They were complicit in his suffering and may have hastened his death.

A dog would have deserved better treatment.

We should reverse.